STATE of Wisconsin,
Plaintiff-Respondent,

v.

DeAnthony K. MULDROW,
Defendant-Appellant.†

Court of Appeals

*No. 2016AP740–CR. Submitted on briefs January 13, 2017.
—Decided June 21, 2017.*

2017 WI App 47

† Petition for Review Filed.

225

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Len Kachinsky* of *Kachinsky Law Offices* of Appleton.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*.

Before Neubauer, C.J., Reilly, P.J., and Hagedorn, J.

¶ 1. HAGEDORN, J. DeAnthony K. Muldrow pled guilty to third-degree sexual assault and sexual assault of a child under sixteen years of age. Nothing in the plea colloquy, however, informed him of the possibility of lifetime GPS monitoring as a consequence of his conviction. Muldrow now seeks plea withdrawal as a matter of right on the grounds that lifetime GPS monitoring is a "punishment" that he must be informed of, the failure of which rendered his plea unknowing and unintelligent in violation of his

constitutional rights. The circuit court denied Muldrow's motion for plea withdrawal, and we affirm.

¶ 2. The precise contours of the test for what constitutes "punishment" are not clear. That said, whether the test is a "fundamental purpose" test as offered by the State or the intent-effects test as used in the ex post facto line of cases, we hold that lifetime GPS monitoring does not constitute punishment and is not a direct consequence of a defendant's plea. Because Muldrow did not need to be informed of this collateral consequence to his plea, he has not made a prima facie case that the circuit court failed to comply with WIS. STAT. § 971.08 (2015–16)[1] or other court mandated plea colloquy procedures. Accordingly, he is not entitled to withdraw his plea.

## BACKGROUND

¶ 3. In 2009, Muldrow was charged with two counts of sexual assault of a child under sixteen years of age, two counts of third-degree sexual assault, and one count of felony bail jumping. In June 2010, Muldrow pled guilty to one count of sexual assault of a child under sixteen years of age and one count of third-degree sexual assault, reducing his potential prison exposure from 106 years to 50 years. Muldrow and the State then stipulated to a deferred judgment agreement (DJA) for the sexual assault of a child count and two years in prison for the third-degree count. The circuit court adopted the joint recommendation of the parties and sentenced Muldrow according to the stipulation. It is undisputed that neither the circuit court

---

[1] All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted.

nor Muldrow's counsel informed him that his plea could subject him to lifetime GPS monitoring after he completed his sentence.

¶ 4. The State moved to vacate the DJA in December 2014; the court granted the State's request in April 2015 and entered judgment on the sexual assault of a child under sixteen years of age. Consistent with the parties' "joint recommendation," the court withheld sentence and imposed ten years of probation. The same day he was sentenced, Muldrow moved to withdraw his plea based on the circuit court's failure to inform him that he could be subject to lifetime GPS monitoring.

¶ 5. As Muldrow had not yet completed his sentence, the conditions of lifetime GPS monitoring had not yet been imposed.[2] As a result, the State and Muldrow agreed that the postconviction court could "take judicial notice of the practical conditions of GPS set forth in" the federal district court decision of *Belleau v. Wall*, 132 F. Supp. 3d 1085 (E.D. Wis. 2015),[3] a federal case challenging lifetime GPS monitoring as an ex post facto violation.

¶ 6. Per the factual stipulations in *Belleau*, a person subject to lifetime GPS tracking must wear a 2.5 x 3.5 x 1.5 inch battery-powered tracking device around his or her ankle at all times for the rest of his or her life. *Id.* at 1090. It is a felony to tamper with the device in any way. *Id.* The device can never be removed —even while showering, bathing, and sleeping— sometimes causing discomfort and blistering. *Id.* Every twenty-four hours, the wearer must plug the device

---

[2] However, the State does agree that Muldrow will be subject to lifetime GPS monitoring.

[3] The decision was later overruled by *Belleau v. Wall*, 811 F.3d 929, 937–38 (7th Cir. 2016), which we discuss below.

into an electrical outlet to charge for approximately one hour (while, of course, continuing to wear the device). *Id.* The device "creates a noticeable bulge under the wearer's pants leg and can become visible if his pants leg raises up, such as when the wearer sits or bends down." *Id.* at 1091. This may allow others to infer that the wearer is a sex offender, subjecting him or her to embarrassment, harassment, or even violence.[4] See *id.* Additional details of the conditions of lifetime GPS tracking will be set forth below.

¶ 7. The postconviction court concluded that lifetime GPS monitoring was not punishment, and therefore, not a direct consequence of Muldrow's plea. Accordingly, the court denied Muldrow's motion to withdraw his plea. Muldrow appeals.

## DISCUSSION

¶ 8. Muldrow alleges he is entitled to plea withdrawal because lifetime GPS monitoring is a potential punishment of which he was not informed, and that this failure violated his due process rights. The parties agree that Muldrow's conviction subjects him to lifetime GPS monitoring and that the circuit court did not inform him of this fact. Muldrow does not challenge any other part of the plea.

### *Legal Background*

¶ 9. When a defendant pleads guilty or no contest, he or she necessarily waives certain constitu-

---

[4] The district court in *Belleau* noted that at least one person had noticed the device and "brandished a gun and warned [Belleau] to stay away." *Belleau v. Wall*, 132 F. Supp. 3d 1085, 1091 (E.D. Wis. 2015), *rev'd* 811 F.3d at 937–38 (7th Cir. 2016).

tional rights—the rights to trial by jury and to confront one's accuser for example. *See State v. Burton*, 2013 WI 61, ¶ 73, 349 Wis. 2d 1, 832 N.W.2d 611. The Fourteenth Amendment to the United States Constitution provides in relevant part that no State shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has held that due process protects defendants who seek to waive their constitutional rights when they plead guilty or no contest. A court should only accept a guilty plea when it has been knowing, intelligent, and voluntary, "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970) (footnote omitted).

■■■

¶ 10.　The circuit court is not required to inform a defendant of every consequence of his or her plea. Rather, the due process right undergirding a knowing and intelligent plea requires knowledge of the direct consequences of the plea. *State v. Bollig*, 2000 WI 6, ¶ 16, 232 Wis. 2d 561, 605 N.W.2d 199. A direct consequence is "one that has a definite, immediate, and largely automatic effect on the range of [a] defendant's *punishment.*" *Id.* (emphasis added). A defendant does not have any due process right to be informed about collateral consequences of his or her plea. *Id.* A collateral consequence is "indirect" and does "not flow from the conviction."[5] *State v. Byrge*, 2000 WI 101,

---

[5] Collateral consequences may be "contingent on a future proceeding in which a defendant's subsequent behavior affects the determination," or consequences not imposed by the circuit court, but "a different tribunal or government agency." *State v. Byrge*, 2000 WI 101, ¶ 61, 237 Wis. 2d 197, 614 N.W.2d 477. For example, resentencing upon revocation of probation is only a collateral consequence of a guilty plea because it is contin-

¶ 61, 237 Wis. 2d 197, 614 N.W.2d 477. "The distinction between direct and collateral consequences essentially recognizes that it would be unreasonable and impractical to require a circuit court to be cognizant of every conceivable consequence before the court accepts a plea." *Id.*

¶ 11. The Wisconsin legislature has established procedures to assist the circuit court in complying with the constitutional imperatives. *State v. Bangert*, 131 Wis. 2d 246, 260–61, 389 N.W.2d 12 (1986). Among the requirements, a court must, "Address the defendant personally and determine that the plea is made voluntarily with understanding of the nature of the charge and the *potential punishment* if convicted." Wis. Stat. § 971.08(1)(a) (emphasis added). The Wisconsin Supreme Court has—pursuant to its superintending and administrative authority—added to and reformulated the requirements of § 971.08. *Bangert*, 131 Wis. 2d at 267; *State v. Cross*, 2010 WI 70, ¶ 16, 326 Wis. 2d 492, 786 N.W.2d 64. Regarding punishment, the court has construed the "potential punishment" requirement in § 971.08 to mean that the colloquy must establish the defendant's understanding of "the *range of punishments* to which he is subjecting himself by entering a plea." *State v. Brown*, 2006 WI 100, ¶ 35, 293 Wis. 2d 594, 716 N.W.2d 906 (emphasis added).

gent on the defendant's own behavior and is not a "definite, immediate, nor largely automatic consequence of his plea." *State ex rel. Warren v. Schwarz*, 219 Wis. 2d 615, 638, 579 N.W.2d 698 (1998) (citation omitted). We have also held that a federal restriction on firearm possession based upon a criminal conviction is a collateral consequence because its enforcement "is not a decision in which the trial court participates." *State v. Kosina*, 226 Wis. 2d 482, 488–89, 595 N.W.2d 464 (Ct. App. 1999).

¶ 12. Thus, the question here is whether, pursuant to Wis. Stat. § 971.08 and the requirements of due process, lifetime GPS monitoring is a direct consequence—or more precisely, whether lifetime GPS monitoring is a "punishment" at all. *State v. Dugan*, 193 Wis. 2d 610, 618, 534 N.W.2d 897 (Ct. App. 1995) (explaining that whether something is a punishment is a "threshold question" to whether it is a direct consequence of the plea); *see also Bollig*, 232 Wis. 2d 561, ¶ 16 (framing the question as "whether the registration requirement constitutes punishment"). If it is, Muldrow has established a prima facie case for plea withdrawal. Whether he has met his burden is a question of law we review de novo. *Dugan*, 193 Wis. 2d at 617.

### The Legal Test

¶ 13. Litigants before us typically agree on how to answer the question—i.e., the basic legal test—but argue its application. Here, the parties offer different legal frameworks for determining whether a consequence constitutes punishment. Muldrow suggests we use the test employed in the ex post facto line of cases to determine whether lifetime GPS monitoring is a punishment for purposes of plea withdrawal—what's known as the intent-effects test. The State disagrees. Rather, the State maintains that whether a law imposes punishment for plea withdrawal purposes depends on the "fundamental purpose" of the provision at issue.

¶ 14. It is easy to understand why Muldrow might borrow the ex post facto analytical framework. The question of whether an ex post facto violation has

occurred similarly looks to whether a statute is "punishment." *State v. Radaj*, 2015 WI App 50, ¶ 13, 363 Wis. 2d 633, 866 N.W.2d 758. The United States Supreme Court has prescribed the intent-effects test to determine whether a consequence constitutes punishment under the ex post facto clause. *State v. Scruggs*, 2017 WI 15, ¶ 16, 373 Wis. 2d 312, 891 N.W.2d 786 (citing *Hudson v. United States*, 522 U.S. 93 (1997)). The "intent" prong examines the legislative intent—which "is primarily a matter of statutory construction." *Scruggs*, 373 Wis. 2d 312, ¶¶ 16–17 (citation omitted). If the legislative intent "was to impose punishment, the law is considered punitive and our inquiry ends there." *Id.*, ¶ 16. However, if the intent was to enact "a civil and nonpunitive regulatory scheme," then we consider whether the law "is so punitive in form and effect as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty.' " *Id.* (citation omitted). In order to determine whether something is "punitive in effect" the following, non-exhaustive list of factors are "useful guideposts":

> (1) whether [the law in question] involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which [the law] applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Radaj*, 363 Wis. 2d 633, ¶ 14 (citation omitted; alteration in original); *see also Hudson*, 522 U.S. at 99 (describing the factors as "useful guideposts");

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963). The Supreme Court has clarified that even where some of these factors indicate a punitive effect, " 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100 (citation omitted).

¶ 15. Two principal Wisconsin cases analyze whether a consequence is punishment for purposes of plea withdrawal—*Dugan* and *Bollig*. Neither explicitly invokes the intent-effects test.

¶ 16. In *Dugan*, this court addressed whether court-ordered restitution was a punishment such that the failure to warn of it entitled the defendant to plea withdrawal. We observed at the outset that whether something is punitive is not simply an all-yes or all-no proposition; it can be both. *Dugan*, 193 Wis. 2d at 620. Restitution is a rehabilitative tool but without doubt also works a punitive effect "by appropriating the offender's money or property to pay the victim." *Id.* The real question, we said, was what is the "fundamental purpose" or "primary and fundamental goal" of the provision. *Id.* at 620–21.

¶ 17. Our analysis observed that the restitution provision was not in the "Penalties" section of the statutes. *Id.* at 621. The word "restitution" itself connotes an equitable remedy, and "does not have a punitive ring." *Id.* Furthermore, our prior cases and cases from other jurisdictions describe the aims of restitution as primarily rehabilitative. *Id.* at 621–24. Thus, we concluded the primary goal of restitution was not punishment. *Id.* at 620–21.

¶ 18. Our analysis in *Dugan* began and ended with the intent of the provision. *Id.* at 620–22. We briefly acknowledged the presence of punitive impacts

235

on the defendant, but reasoned that "simply saying a sentencing provision works a punitive or rehabilitative effect begs the question." *Id.* at 620. The court's duty was instead to "decide the fundamental purpose of the sentencing provision at issue." *Id.* The "effects" of the statute did not come into play with any noticeable prominence in our decision. Before us, the State cites *Dugan* for the notion that our inquiry is simply into the "fundamental purpose," and not the intent-effects test.

¶ 19. The State further points out that restitution—the very issue in *Dugan*—has been held to constitute punishment for ex post facto purposes by a great number of federal and state courts. This, the State contends, illustrates that the analysis for what constitutes punishment for plea withdrawal purposes is and should be different from what constitutes punishment under the ex post facto clause.

¶ 20. In *Bollig*, decided five years after *Dugan*, the Wisconsin Supreme Court considered whether mandatory sex offender registration constitutes punishment for plea withdrawal purposes. *Bollig*, 232 Wis. 2d 561, ¶ 15. The court began with the legislative intent behind the registration requirement. It considered the genesis of the law and described its "intention of providing community and parent notification of convicted sex offenders residing within the community." *Id.*, ¶¶ 18–19. The "underlying intent" of the law, the court explained, was "to protect the public and assist law enforcement." *Id.*, ¶¶ 20–21. It noted that registration statutes assist law enforcement agencies in investigation and apprehension of offenders. *Id.*, ¶ 20. The clear goal of sex offender registration was public safety. *Id.*, ¶ 22.

¶ 21. This did not mean, however, that there were no punitive consequences. As the defendant ar-

236

gued, sex offender registration results "in ostracism, humiliation, and retaliation." *Id.*, ¶ 23. The court acknowledged various punitive effects of the law, including "vandalism, loss of employment, and community harassment." *Id.*, ¶ 26. But the court also observed that information regarding the offender is not indiscriminately provided to the general public, which showed the "core concern" was public protection. *Id.*, ¶ 24. In the end, the court concluded, "Simply because registration can work a punitive effect, we are not convinced that such an effect overrides the primary and remedial goal underlying [the sex offender registration statute] to protect the public." *Id.*, ¶ 26.

¶ 22. *Bollig*'s treatment of the sex offender registry could be construed as a truncated application of the intent-effects test. The court first examined the intent of the law, and then turned to its punitive effects. Of particular note, the court spoke of whether the punitive effect "overrides" the legislature's nonpunitive intent— the same language employed by the United States Supreme Court to refer to the relationship between the intent and effects prong in the ex post facto context. *See Hudson*, 522 U.S. at 100 (concluding that under the intent-effects test " 'only the clearest proof' will suffice to *override* legislative intent and transform what has been denominated a civil remedy into a criminal penalty" (emphasis added; citation omitted)); *see also Smith v. Doe*, 538 U.S. 84, 92 (2003) (quoting *Hudson*). On the other hand, the bulk of *Bollig*'s analysis concerned the nonpunitive intent, and the effects were addressed only briefly. Nor did the court cite the list of factors ordinarily used under the intent-effects line of cases, or otherwise reference those cases. *Bollig* also did not withdraw any language from or cast doubt upon the plea withdrawal analysis in *Dugan*.

237

¶ 23. Muldrow and the State both advance a reasonable interpretation of the applicable case law. However, we need not definitively decide whether the proper analysis is the intent-effects test, the "fundamental purpose" approach used in *Dugan*, or some other iteration of the inquiry. We conclude that no matter which test is applied, the result here is the same. The intent and primary goal of lifetime GPS monitoring is clearly to protect the public and is nonpunitive in nature. And while the statutory scheme no doubt works some nontrivial punitive effects, these punitive effects do not override the primarily nonpunitive intent.

## *Is Lifetime GPS Monitoring Punishment?*

¶ 24. This brings us to the first part of our analysis: whether the "fundamental purpose" or "intent" of lifetime GPS monitoring is punitive. We begin with an analysis of the provision's statutory text, context, and structure.

¶ 25. Lifetime GPS monitoring is found in Wis. Stat. ch. 301 governing corrections, not in the criminal penalties chapters of the statutes. *Dugan*, 193 Wis. 2d at 620–22 (looking to the statutory placement of the consequence). It also follows several other provisions dealing with sex offenders that appear to have similar goals.

¶ 26. Wisconsin Stat. § 301.45 places annual registration requirements on sex offenders, and orders the Department of Corrections (DOC) to obtain and maintain certain highly personal information, including addresses at which the person will be residing (§ 301.45(2), (5)), every email account, internet user name, public or private internet profile, or internet site

created or maintained (§ 301.45(2)(a)6m). The sex offender registration statute also has provisions restricting the circumstances in which an offender can move. *See, e.g.*, § 301.45(4m) & (4r). The registry even has application to certain persons who did not commit a crime in this state, but may be registered pursuant to the laws of another state. Sec. 301.45(5m). In addition, DOC is authorized to impose an annual fee on registrants to offset the costs. Sec. 301.45(10). As *Bollig* explains, the primary goal of these extensive and intrusive provisions is protection of the public, not punishment. *Bollig*, 232 Wis. 2d 561, ¶ 21.

¶ 27. WISCONSIN STAT. § 301.46 governs information about registered sex offenders, and makes some information available to certain organizations, generally focused on law enforcement, health organizations, or other organizations "in the interest of protecting the public." Sec. 301.46(4)(a)(14).

¶ 28. WISCONSIN. STAT. § 301.47 prohibits registered sex offenders from changing their names. And WIS. STAT. § 301.475 prohibits sex offenders from entering school grounds without authorization. *See* § 301.475(1).

¶ 29. Following these provisions, WIS. STAT. § 301.48 was created and is entitled, "Global positioning system tracking and residency requirements for certain sex offenders." Thus, lifetime GPS tracking must be seen in its statutory context as an additional public safety measure and limitation on some sex offenders. GPS tracking does not apply to everyone. Rather it is aimed primarily at those who have committed, in the legislature's words, a "serious child sex offense." Sec. 301.48(1)(e) & (2). DOC is also given authority to impose GPS tracking on certain individuals following a risk assessment. Sec. 301.48(2g).

¶ 30. Lifetime GPS monitoring is designed to "electronically monitor the whereabouts of persons who are subject to this section." WIS. STAT. § 301.48(3)(a). This includes monitoring certain zones labeled exclusion and inclusion zones. Exclusion zones are zones that subject individuals may only pass through to get to another area. Sec. 301.48(1)(a). Inclusion zones are areas where subject individuals may not leave at all. Sec. 301.48(1)(c). These zones are to be defined by DOC "if necessary to protect public safety" by, for example, focusing "on areas where children congregate." Sec. 301.48(3)(c). The system must alert both DOC and law enforcement if exclusion or inclusion zone restrictions are violated. Sec. 301.48(3)(a)3. Similar to the sex offender registry, the legislature has authorized assessing the cost for GPS monitoring to the individual (minus the $100 cap present for the registry). *See* § 301.48(4).

¶ 31. Despite the locution "lifetime," the legislature has established a procedure that enables offenders to seek the termination of lifetime GPS tracking after twenty years. WIS. STAT. § 301.48(6). The process includes examination by a psychiatrist or psychologist to determine if the person "is a danger to the public." Sec. 301.48(6)(e). DOC then makes a recommendation to the court as to whether in its view lifetime GPS tracking "is still necessary to protect the public." Sec. 301.48(6)(f). Following the filing of this and other information, the court conducts a hearing to determine, once again, "whether lifetime tracking should be continued because the person who filed the petition is a danger to the public." Sec. 301.48(6)(g). The court may grant the petition to terminate lifetime tracking if it "is no longer necessary to protect the public." Sec. 301.48(6)(h).

¶ 32. The legislature further provided that DOC may petition to terminate lifetime tracking "if the person is permanently physically incapacitated." Wis. Stat. § 301.48(7). At this hearing, the court may grant the petition to terminate if the person "is permanently physically incapacitated so that he or she is not a danger to the public." Sec. 301.48(7)(e).

¶ 33. Finally, the legislature provided that tracking terminates if the person moves out of the state. Wis. Stat. § 301.48(7m). Thus, lifetime tracking does not necessarily follow an offender forever; he or she may move out of state and escape this restriction altogether where, presumably, the person is no longer a danger to Wisconsin citizens.

¶ 34. Although not applicable to Muldrow, in the section immediately following lifetime GPS tracking for certain sex offenders, the legislature also authorized DOC to conduct GPS tracking for persons who violate orders or injunctions related to domestic abuse under Wis. Stat. § 813.12 and harassment under Wis. Stat. § 813.125. Wis. Stat. § 301.49. Although this is not lifetime tracking, the structure is substantially similar, and similarly aimed at the safety of petitioners who sought the order or injunction.

¶ 35. This high level overview of lifetime GPS monitoring, both specifically and in its statutory context, makes clear that the primary goal of GPS monitoring is not to punish, but to protect the public. The whole design of GPS monitoring is (unsurprisingly) to monitor. The aim is to know where potentially dangerous sex offenders are and have been. The designation of various zones where subject individuals must stay, or may only enter for the purposes of passing through, are set up only if necessary and with the stated goal of

protecting the public, especially children, from danger. The individuals subject to this are not all persons who have committed sexual assault against children, but those who have committed serious child sex offenses. The legal standard for terminating lifetime GPS monitoring is protecting the public from danger. And when there is no danger to Wisconsin citizens because an offender has moved out of state, lifetime GPS monitoring does not apply. All of this points to a clearly stated and obvious statutory goal: protecting the public from potentially dangerous child sex offenders. The fact that the legislature also instituted GPS monitoring for domestic abuse and harassment violations also shows the same intent—protecting the vulnerable from the dangerous. To the extent the proper test is primarily or exclusively intent-focused, lifetime GPS monitoring does not constitute punishment.[6]

¶ 36. To the extent the test requires an analysis of effects as well, we press on. We do not think the punitive effects of GPS tracking are so onerous as to "transform what has been denominated a civil remedy into a criminal penalty," or—to use *Bollig*'s parlance—

---

[6] Muldrow's reliance on *People v. Cole*, 817 N.W.2d 497 (Mich. 2012)—which held that Michigan's lifetime electronic monitoring provision was punishment—is misplaced. The Michigan statute was located in the penalty sections of the code and explicitly provided that lifetime electronic monitoring was part of the defendant's "sentence" and in "addition to any other penalty." *Id.* at 335–36. Thus, the Michigan Supreme Court ended its analysis with the conclusion that the legislature intended the provision as punishment. *Id.*; *see also Smith v. Doe*, 538 U.S. 84, 92 (2003) (explaining that "[i]f the intention of the legislature was to impose punishment, that ends the inquiry"). In contrast, our legislature did not intend lifetime GPS monitoring as a punishment.

"override" the legislature's predominantly nonpunitive intent. The Seventh Circuit Court of Appeals recently had an opportunity to examine Wisconsin's lifetime GPS monitoring for an ex post facto violation. *Belleau v. Wall*, 811 F.3d 929, 937–38 (7th Cir. 2016). Utilizing the intent-effects test, the court concluded, and we agree, that Wɪs. Sᴛᴀᴛ. § 301.48 was not punitive. We will track the "useful guideposts" to determine whether Muldrow has provided "the clearest proof" that the punitive effects "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *See Hudson*, 522 U.S. at 100 (citation omitted).

¶ 37. Without doubt, several factors indicate some punitive effect. Under the first factor, lifetime GPS monitoring, particularly with its potential inclusion and exclusion zones, involves an affirmative disability or restraint. It also will no doubt—because of its severity—serve a deterrent effect (factor four). *See Belleau*, 811 F.3d at 943 (Flaum, J., concurring) (noting that "[a]ny number of governmental programs might deter crime without imposing punishment" (citation omitted)). And, as already discussed, the statute applies to conduct (serious child sex offenses) that is already a crime (factor five), "suggesting that the [statute] has the effect of punishing criminal behavior." *See Scruggs*, 373 Wis. 2d 312, ¶ 43.

¶ 38. However, the remaining factors indicate the GPS statute is predominantly nonpunitive in effect. With regard to the second factor, GPS tracking is not similar to historical forms of punishment like public shaming. It is possible that people may notice the ankle monitor and come to negative conclusions about Muldrow or harass him. But this is hardly comparable to the historic public shaming, which was

243

"designed to be noticeable, even prominent." *See Belleau*, 811 F.3d at 943 (Flaum, J., concurring). The device is worn around the ankle, and, although it is sometimes visible, public stigma and shaming is not the primary or intended effect. *Id.* The third factor queries whether the consequence requires a finding of scienter; none is present here. Regarding the sixth factor, as discussed at length, the GPS statute has a pervasive and obvious nonpunitive intent: protection of the public from future sex crimes. The legislature's determination that the risk of reoffense is unacceptably high is perfectly rational, and the statute here is directly aimed at combatting this risk by monitoring those who commit serious sex offenses.

¶ 39. The final *Mendoza-Martinez* factor queries whether the statute is excessive in relation to its purpose to protect the public. This—and really all of the factors—is aimed at the main question of assessing the practical effects of lifetime GPS monitoring versus its purpose. Without question, such monitoring imposes substantial burdens on subject individuals. It must surely be intrusive and restrictive and bothersome to the wearer of a tracking device. Someone could find out—through observing the monitor itself or otherwise—that a person is subject to GPS monitoring, and this could result in embarrassment, exclusion, or worse. The exclusion and inclusion zones also work a very real and burdensome restriction that could make day-to-day life onerous to say the least. Picking up children from school, swimming at the public pool with the device conspicuously visible, and going out to eat at your favorite restaurant could be challenging, or for some, even impossible. Subject individuals also may bear the cost of monitoring. All of this is a certain deprivation of liberty and property and, by normal

societal standards, a dramatic invasion of privacy. None of this should be minimized.

¶ 40. But merely having substantial punitive effects does not automatically render a statute punitive even assuming an intent-effects analysis. The design and legal standards governing lifetime GPS monitoring all point to the obvious goal of protecting the public from dangerous child sex offenders. No one seems to dispute the serious risk of reoffense posed by those who commit sexual crimes against children.[7] And though the monitoring is potentially indefinite, one can petition to remove it when the danger is no longer present. *Ray v. State*, 982 P. 2d 931, 936 (Idaho 1999) ("Another factor lessening the punitive aspect of the requirement is that the registrant can petition to be released from the requirements after ten years."). The legislature has established a reasonable scheme to monitor those who pose a serious risk of harm to others. Though no doubt significant, lifetime GPS monitoring presents nowhere near the level of restriction occasioned by civil commitments and sex offender registries, both of which have been found nonpunitive by the Supreme Court. *See Smith*, 538 U.S. at 92–96 (sex offender registry); *Kansas v. Hendricks*, 521 U.S. 346, 368–69 (1997) (civil commitment). As Judge Posner said in *Belleau*, "if civil commitment is not punishment, as the Supreme Court has ruled, then *a fortiori* neither is having to wear an anklet monitor." *Belleau*, 811 F.3d at 937.

---

[7] Although no one disputes that reoffense is a serious risk, some debate whether the recidivism rates for sex offenders are actually higher than the rates for other crimes. *See, e.g.,* Adam Liptak, *Did the Supreme Court Base a Ruling on a Myth?,* N.Y. Times, March 6, 2017, *available at* https://www.nytimes.com/2017/03/06/us/politics/supreme-court-repeat-sex-offenders.html?_r =0 (last visited June 12, 2017).

¶ 41. In short, Muldrow has not, under the intent-effects test he posits, established the "clearest proof" that the punitive effects present here are so significant that they "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."[8] *See Hudson*, 522 U.S. at 100.

## CONCLUSION

¶ 42. Thus, whether one looks to the purpose alone, or at both the intent and effects, lifetime GPS monitoring is not punishment, and therefore, not a direct consequence that Muldrow had to be informed of prior to his plea. Accordingly, Muldrow has not made a prima facie case that the circuit court failed to comply with section Wis. Stat. § 971.08 or other court mandated plea colloquy procedures, and he is not entitled to withdraw his plea.

*By the Court.*—Judgment and order affirmed.

[8] Alternatively, we note that in order for something to be a direct consequence, it not only needs to be punishment, but "a definite, immediate, and largely automatic effect" on that punishment. *State v. Bollig*, 2000 WI 6, ¶ 16, 232 Wis. 2d 561, 605 N.W.2d 199. Without consideration of the purpose or effects, an argument can be made that this prerequisite is not satisfied here because a defendant is removed from this restriction altogether by leaving the state. Thus, it seems hard to call the effect on a defendant here "definite"—burdensome, certainly, but not definite.