Justice NEWBY dissenting.
The Supreme Court of the United States held that the North Carolina statutory scheme for satellite-based monitoring (SBM) of a limited class of sex offenders effected a Fourth Amendment search and remanded this case for consideration of whether the search was reasonable. As the Supreme Court stated, "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." Grady v. North Carolina , --- U.S. ----, 135 S. Ct. 1368, 1371, 191 L.Ed. 2d 459, 462 (2015) (per curiam). For guidance, the Supreme Court provided two examples of categorical searches which specifically addressed *573 the reasonableness inquiry. Id. at 1371, 191 L.Ed. 2d at 462-63 (citing Samson v. California , 547 U.S. 843, 126 S. Ct. 2193, 165 L.Ed. 2d 250 (2006) ; Vernonia School Dist. 47J v. Acton , 515 U.S. 646, 115 S. Ct. 2386, 132 L.Ed. 2d 564 (1995) ). This case raises substantial competing interests: the State's interest in protecting children from sexual abuse and an individual's right to privacy from government monitoring. The Fourth Amendment's reasonableness test requires balancing these interests to determine whether the government's SBM is a reasonable search of this limited class of sex offenders.
Using the remand as an opportunity to make a broad policy statement, the majority, though saying it addresses only one statutory classification, recidivist, applies an unbridled analysis which understates the crimes, overstates repeat sex offenders' legitimate expectations of privacy, and minimizes the need to protect society from this limited class of dangerous sex offenders. The majority's sweeping opinion could be used to strike down every category of lifetime monitoring under the SBM statute.
**552 The majority appears to pick and choose between the characteristics of as-applied and facial challenges in finding a statute wholly unconstitutional. Nonetheless, its analysis does not support its conclusion that the statute is unconstitutional, either facially or as applied to this defendant. Its approach does not consider the specific facts of this defendant's convictions and improperly classifies this defendant's crimes under the statute. Creating an "as-applied" category not found in the statute, the majority fails to conduct the proper constitutionality inquiry, which requires it to consider lifetime SBM for the highest risk sex offender that falls within the statute's recidivist category. To reach its result, the majority minimizes and mischaracterizes the heinous crimes committed by defendant and others covered by the statute and diminishes the State's significant interest in protecting its citizens. The majority usurps the role of the legislature, denying the legislature's findings of the significance of this societal problem and rejecting the efficacy of its solution. Further, it rejects the facts found by the trial court and finds its own.
Here defendant's crimes of sexually assaulting children on two occasions make him a member of two statutory classes of sex offenders-aggravated offenders and recidivists-whom the General Assembly has determined to be among the most dangerous to society. Sex offenders who target children pose a unique threat to public safety, and the State's interest in protecting children from sexual assault is paramount. Sadly, these despicable crimes targeting vulnerable children are on the rise. The General Assembly carefully crafted a regulatory framework to protect the public by deterring sexual violence. To accomplish this purpose, the statute provides lifetime SBM for only a small group of the worst sex offenders. While courts must continue to carefully review the government's intrusions upon reasonable privacy interests as search technology develops, here the State's paramount interest outweighs the State's intrusion into defendant's diminished Fourth Amendment privacy interests. Because the SBM program is constitutional, both facially and as applied to defendant, I respectfully dissent.
I. Facts and Procedural History
Defendant's crimes qualify him as an aggravated sex offender and a violent recidivist under the statutory framework.[1] On 10 May 1996, defendant, then aged seventeen, committed a sexual assault involving anal sex on a seven-year-old boy while the victim's younger brother watched. Defendant was charged with first-degree sexual offense and **553 taking indecent liberties with children. On 16 January 1997, he pled no contest to a second-degree sex offense, defined as "engag[ing] in a sexual act ... by force and against the will of the other person," and received a sentence of seventy-two to ninety-six months. N.C.G.S. § 14-27.5(a) (2013) (current version at id. § 14-27.27(a) (Supp. 2018)).
On 5 August 2002, defendant was released from prison. Only seventeen months later on 6 January 2004, defendant was convicted of *574 not having registered as a sex offender. The trial court suspended his twenty-one to twenty-six month sentence and ordered thirty-six months of probation. On 21 September 2004, defendant received notice of multiple probation violations, and after a hearing, the trial court granted defendant another chance by placing him on intensive supervision on 16 December 2004. On 23 February 2005, however, defendant's probation was revoked because of additional probation violations, and the trial court reinstated defendant's active sentence.
Beginning in January 2005, before the revocation of his probation and while under intensive supervision, defendant, then aged twenty-six, engaged in an illegal sexual relationship with and impregnated a fifteen-year-old girl. On 13 September 2006, defendant pled guilty to taking indecent liberties with a child, and the State dismissed a statutory rape charge. Defendant received and served a sentence of thirty-one to thirty-eight months. The Department of Correction (DOC) unconditionally discharged defendant on 25 January 2009.
On 12 March 2010, DOC sent defendant a letter giving notice of defendant's upcoming SBM determination hearing. Before that hearing could take place, however, defendant was arrested on 16 July 2010 for again failing to properly comply with the sex offender registry requirements. On 27 October 2010, defendant pled guilty and this time received a sentence of twenty-four to twenty-nine months. Defendant was released from prison on 24 August 2012, and on 14 May 2013, the trial court conducted defendant's SBM determination hearing and concluded that defendant's two sex crimes were "sexually violent offenses" and that defendant met the criteria for a recidivist sex offender.[2] See id.
**554 § 14-208.6(2b), (5) (Supp. 2018). As required by statute, the trial court ordered defendant to enroll in lifetime SBM. See id. § 14-208.40B(c) (2017). Significantly, since enrolling in SBM more than six years ago, defendant has not been charged with any additional offenses.
Defendant appealed the SBM order, and the Court of Appeals affirmed the trial court order. State v. Grady , 233 N.C. App. 788, 759 S.E.2d 712, 2014 WL 1791246, at *2-3 (2014) (unpublished). Upon further appeal to the United States Supreme Court, defendant asserted enrollment in lifetime SBM violates the Fourth Amendment. Concluding that continuous satellite-based location monitoring effects a Fourth Amendment search, the Supreme Court vacated the lower court's judgment and remanded this case to our Court to "examine whether the State's monitoring program is reasonable" under the Fourth Amendment. Grady , 135 S. Ct. at 1371, 191 L.Ed. 2d at 463.
The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV.
The Fourth Amendment prohibits only unreasonable searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. See, e.g. , Samson v. California , 547 U.S. 843, 126 S. Ct. 2193, 165 L.Ed. 2d 250 (2006) (suspicionless search of parolee was reasonable); Vernonia School Dist. 47J v. Acton , 515 U.S. 646, 115 S. Ct. 2386, 132 L.Ed. 2d 564 (1995) (random drug testing of student athletes was reasonable).
Grady, 135 S. Ct. at 1371, 191 L.Ed. 2d at 462-63. The Supreme Court's remand mandate instructed this Court to determine whether lifetime SBM is a reasonable search for those classified as the most dangerous sex offenders. "[W]e 'examin[e] the totality of *575 the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." Samson , 547 U.S. at 848, 126 S. Ct. at 2197, 165 L.Ed. 2d at 256 (second alteration in original) (quoting United States v. Knights , 534 U.S. 112, 118, 122 S. Ct. 587, 591, 151 L.Ed. 2d 497, 505 (2001) ). This examination must consider the government's purpose in conducting the search and the nature of the search balanced with the degree of intrusion upon the recognized privacy interest. See Grady , 135 S. Ct. at 1371, 191 L.Ed. 2d at 462-63. In assessing reasonable expectations of privacy, "[t]he Fourth Amendment does not protect all subjective expectations **555 of privacy, but only those that society recognizes as 'legitimate.' What expectations are legitimate varies, of course, with context." Vernonia , 515 U.S. at 654, 115 S. Ct. at 2391, 132 L.Ed. 2d at 575 (citing and quoting New Jersey v. T.L.O. , 469 U.S. 325, 337-38, 105 S. Ct. 733, 740-41, 83 L.Ed. 2d 720, 731-32 (1985) ).
By citing Samson and Vernonia , the Supreme Court suggested that both the general reasonableness test and special needs doctrine are pertinent in evaluating the reasonableness of the SBM statute. See Samson , 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L.Ed. 2d at 259 n.3 (applying a general reasonableness test); Vernonia , 515 U.S. at 653, 115 S. Ct. at 2391, 132 L.Ed. 2d at 574 (applying the special needs doctrine). Though involving different criteria, both analyses require the balancing test specified in the remand order to determine whether the statute at issue here is valid. See Samson , 547 U.S. at 848, 126 S. Ct. at 2197, 165 L.Ed. 2d at 256 ; Vernonia , 515 U.S. at 652-53, 115 S. Ct. at 2390, 132 L.Ed. 2d at 574.
In Samson the Supreme Court applied "general Fourth Amendment principles" to evaluate the reasonableness of a statute that required parolees to agree to any warrantless search, without cause, at any time. 547 U.S. at 846, 853 n.3, 126 S. Ct. at 2196, 2200 n.3, 165 L.Ed. 2d at 255, 260 n.3. The Supreme Court evaluated the search's reasonableness "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Id. at 848, 126 S. Ct. at 2197, 165 L.Ed. 2d at 256 (quoting Knights , 534 U.S. at 118-19, 122 S. Ct. at 591, 151 L.Ed. 2d at 505 ). The Supreme Court first concluded that parolees "have severely diminished expectations of privacy by virtue of their status alone." Id. at 852, 126 S. Ct. at 2199, 165 L.Ed. 2d at 259. Then viewing that diminished privacy in the totality of the circumstances, the Supreme Court concluded the warrantless search did not intrude upon "an expectation of privacy that society would recognize as legitimate," despite the unlimited breadth of the right to search and regardless of the crime of conviction. Id. at 852, 126 S. Ct. at 2199, 165 L.Ed. 2d at 259. Therefore, balancing no intrusion upon any reasonable expectation of privacy against the State's substantial interests in deterring recidivism, the Supreme Court found the statute constitutional under the Fourth Amendment. Id. at 853, 857, 126 S. Ct. at 2200, 2202, 165 L.Ed. 2d at 259-60, 262.
In Vernonia the Supreme Court applied the same balancing test for a warrantless search "when special needs, beyond the normal need for law enforcement, ma[d]e the warrant ... requirement impracticable."
**556 515 U.S. at 653, 115 S. Ct. at 2391, 132 L.Ed. 2d at 574 (quoting Griffin v. Wisconsin , 483 U.S. 868, 873, 107 S. Ct. 3164, 3168, 97 L.Ed. 2d 709, 717 (1987) ). A school policy required that high school athletes consent to random drug screenings in order to participate in school athletics. Id. at 650, 115 S. Ct. at 2389, 132 L.Ed. 2d at 572. The Court determined that student athletes had diminished expectations of privacy because the school had a special relationship with the students (in loco parentis ) and because "[p]ublic school locker rooms [where the drug screenings take place] ... are not notable for the [bodily] privacy they afford." Id. at 655-57, 115 S. Ct. at 2391-93, 132 L.Ed. 2d at 575-77. Next, the Court examined the intrusion upon privacy by the drug screening process and determined it had a "negligible" effect on the defendant's privacy interests. Id. at 658, 115 S. Ct. at 2393, 132 L.Ed. 2d at 578. Moreover, the State's important interest in deterring drug use among teenagers, particularly for the narrow, at-risk category of student *576 athletes, justified the search under a Fourth Amendment reasonableness analysis. Id. at 661-62, 665, 115 S. Ct. at 2395, 2397, 132 L.Ed. 2d at 579-80, 582.
On remand in the present case, this Court further remanded this matter to the trial court to proceed according to the United States Supreme Court's mandate. The trial court held a new hearing on 16 June 2016. The State introduced evidence that defendant's GPS ankle monitor weighs less than nine ounces. The monitor holds a charge for about three days, but offenders are encouraged to charge the monitor two hours per day. A "beacon" set up in defendant's home helps preserve the monitor's battery life when defendant is in the beacon's range. A probation officer reviews the monitor and the beacon every three months to ensure the equipment is operating correctly. Unsupervised offenders, like defendant, have no direct contact with probation officers except for quarterly reviews. The monitor provides continuous location tracking of defendant. The SBM system displays defendant's location information as a series of points with arrows that are overlaid onto a map, and a probation officer can view the information as a still image or an image in motion. Officers have access to defendant's live location as well as historic location data for the preceding six months. As of 30 June 2015, only two probation officers were responsible for monitoring the data from over five hundred unsupervised offenders.
In its order, the trial court again determined that defendant's crimes were "sexually violent offenses," which required him to register as a sex offender, and that he was a recidivist, which met the criteria for lifetime SBM. In assessing the reasonableness of the search, the trial court noted the State's evidence characterizing the ankle monitor as **557 small, nonintrusive, and "not prohibit[ing] any defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes." The trial court found that "[t]he ankle monitor does not monitor or reveal the activities of the offender-it merely monitors his location."
While the trial court noted defendant's submission of the State's policies governing SBM and multiple studies of recidivism rates, it found persuasive the long line of United States Supreme Court decisions acknowledging the special threat of repeat sex offenders. The trial court stated:
The United States Supreme Court has long recognized the dangers of recidivism in cases of sex offenders. Smith v. Doe , 538 U.S. 84, 103 [123 S.Ct. 1140, 155 L.Ed.2d 164] (2003) ("The risk of recidivism posed by sex offenders is frightening and high."); McKune v. Lile , 536 U.S. 24, 34 [122 S.Ct. 2017, 153 L.Ed.2d 47] (2002) ("[s]ex offenders are a serious threat [ ] in this nation .... When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."). Additionally, it is within the purview of state governments to recognize and reasonably react to a known danger in order to protect its citizens. Samson v. California , 547 U.S. 843, 848 [126 S.Ct. 2193, 165 L.Ed.2d 250] (2006) ("This Court has acknowledged the grave safety concerns that attend recidivism" and "the Fourth Amendment does not render the States powerless to address these concerns effectively.").
(second alteration in original). Ultimately, the trial court concluded "that based on the totality of the circumstances ... [SBM] of the defendant is a reasonable search. The Court has considered the defendant's argument that the [SBM] statute is facially unconstitutional. The Court rejects this argument and finds that the statute is constitutional on its face."[3]
*577 When substantial and immediate harm threatens children, a State may take proactive, programmatic measures to prevent that harm. See **558 Bd. of Educ. v. Earls , 536 U.S. 822, 835-38, 122 S. Ct. 2559, 2567-69, 153 L.Ed. 2d 735, 747-49 (2002) ; Vernonia , 515 U.S. at 658 n.2, 115 S. Ct. at 2393 n.2, 132 L.Ed. 2d at 578 n.2 (noting the search at issue was a "prophylactic" "blanket search" designed to protect students and deter drug use). The General Assembly has clearly stated the purpose of North Carolina's "Sex Offender and Public Protection Registration Programs" is to proactively protect children and others from dangerous sex offenders:
The General Assembly recognizes that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest.
The General Assembly also recognizes that persons who commit certain other types of offenses against minors ... pose significant and unacceptable threats to the public safety and welfare of the children in this State and that the protection of those children is of great governmental interest. Further, the General Assembly recognizes that law enforcement officers' efforts to protect communities, conduct investigations, and quickly apprehend offenders who commit sex offenses or certain offenses against minors are impaired by the lack of information available to law enforcement agencies about convicted offenders who live within the agency's jurisdiction. ...
Therefore, it is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.
N.C.G.S. § 14-208.5 (2017).
Likewise, the United States Supreme Court has recognized that " 'sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people.' And it is clear that a legislature 'may pass valid laws to protect children' and other victims of sexual **559 assault 'from abuse.' " Packingham v. North Carolina , --- U.S. ----, 137 S. Ct. 1730, 1736, 198 L.Ed. 2d 273, 281 (2017) (quoting Ashcroft v. Free Speech Coal. , 535 U.S. 234, 244-45, 122 S. Ct. 1389, 1399, 152 L.Ed. 2d 403, 417 (2002) ). Furthermore, " '[t]he victims of sex assault are most often juveniles,' and '[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault.' " Conn. Dep't of Pub. Safety v. Doe , 538 U.S. 1, 4, 123 S. Ct. 1160, 1163, 155 L.Ed. 2d 98, 103 (2003) (quoting McKune v. Lile , 536 U.S. 24, 32-33, 122 S. Ct. 2017, 2024, 153 L.Ed. 2d 47, 56-57 (2002) (plurality opinion)). The Supreme Court has emphasized the magnitude of the harm inflicted upon victims, noting a sexual assault on a child "has a permanent psychological, emotional, and sometimes physical impact on the child." Kennedy v. Louisiana , 554 U.S. 407, 435, 128 S. Ct. 2641, 2658, 171 L.Ed. 2d 525, 548 (2008) (citations omitted); see also id. at 467-68, 128 S. Ct. at 2676-77, 171 L.Ed. 2d at 568-69 (Alito, J., dissenting) (discussing the long-term developmental problems sexually abused children can experience (citations omitted)).
Thus, the General Assembly has determined violent sex offenders should be deterred from committing additional sex offenses. To further its paramount interest in protecting the public-especially children-from sex offenders, the General Assembly enacted various programs to monitor and deter sex offenders after their release. For example, "North Carolina, like every other state in the nation, enacted a sex offender registration program to protect the public from the unacceptable risk posed by convicted sex offenders." State v. Bryant , 359 N.C. 554, 555, 614 S.E.2d 479, 480 (2005), superseded *578 on other grounds by statute , An Act to Protect North Carolina's Children/Sex Offender Law Changes, Ch. 247, Sec. 8.(a), 2005 N.C. Sess. Laws (Reg. Sess. 2006) 1065, 1070. See generally Smith v. Doe , 538 U.S. 84, 103, 123 S. Ct. 1140, 1145, 155 L.Ed. 2d 164, 174-75 (2003). Similarly, with the encouragement of Congress, forty-eight states and the District of Columbia have electronic monitoring available for some sex offenders.[4] See 42 U.S.C. § 16981 (2012) **560 (current version at 34 U.S.C.A. § 20981 (West 2017) ) (authorizing grants to states that implement twenty-four-hour, continuous GPS monitoring programs for sex offenders).
North Carolina's "sex offender monitoring program ... uses a continuous satellite-based monitoring system" for narrowly and categorically defined classes of sex offenders who present a significant enough threat of reoffending to "require[ ] the highest possible level of supervision and monitoring." N.C.G.S. § 14-208.40(a) (2017). The four categories of offenders who require continuous lifetime SBM to protect public safety are (1) sexually violent predators, (2) recidivists, (3) aggravated offenders, and (4) adults convicted of statutory rape or a sex offense with a victim under the age of thirteen. Id. § 14-208.40A(c) (2017). A "sexually violent predator" is a person who "has been convicted of a sexually violent offense," such as rape or incest, and "who suffers from a mental abnormality or personality disorder," as determined by a board of experts, that makes the person likely to purposely foster relationships with the intent of sexual victimization or to engage in sexually violent offenses against strangers. Id. §§ 14-208.6(5) - (6), -208.20 (2017 & Supp. 2018). Second, "recidivists" have had at least two "reportable convictions." Id. § 14-208.6(2b). Reportable convictions are serious crimes, including "sexually violent offenses" and various "offense[s] against a minor," such as kidnapping. Id. § 14-208.6(1m), (4)(a) (Supp. 2018). Third, perpetrators of aggravated offenses have convictions for "engaging in a sexual act involving vaginal, anal, or oral penetration" either (1) through use or threat of force or (2) with a child under twelve years old. Id. § 14-208.6(1a) (Supp. 2018). The fourth category includes convictions of any sex act by a person over eighteen years old against any victim under thirteen years old. Id. § 14-27.28 (2017).
**561 In short, mandatory SBM applies only to a small subset of individuals who commit the most serious sex crimes or are repeat offenders. The General Assembly has determined certain convicted sex offenders-namely sexually violent predators, recidivists, perpetrators of aggravated offenses, and adults who *579 sexually victimize children under thirteen years old-"pose a high risk of engaging in sex offenses even after being released from incarceration ... and that protection of the public from sex offenders is of paramount governmental interest." Id . § 14-208.5. Accordingly, the statute categorically requires the trial court to "order the offender to enroll in a satellite-based monitoring program for life." Id. § 14-208.40A(c). Though the program is commonly referred to as "lifetime" monitoring, one year after a defendant completes his sentence, probation, or parole, the defendant may petition the Post-Release Supervision and Parole Commission for termination of enrollment. Id. §§ 14-208.41(a), -208.43 (2017). The defendant must show he has not been convicted of any additional qualifying convictions, has substantially complied with the SBM and registration programs, and "is not likely to pose a threat to the safety of others." Id. § 14-208.43(c).
II. The Majority's Holding
The majority "hold[s] that the application of the relevant portions of N.C.G.S. §§ 14-208.40A(c) and 14-208.40B(c) to individuals in the same category as defendant, under which these individuals are required to submit to a mandatory, continuous, nonconsensual search by lifetime satellite-based monitoring, violates the Fourth Amendment to the United States Constitution. The category to which this holding applies includes only those individuals who are not on probation, parole, or post-release supervision; who are subject to lifetime SBM solely by virtue of being recidivists as defined by the statute; and who have not been classified as a sexually violent predator, convicted of an aggravated offense, or are adults convicted of statutory rape or statutory sex offense with a victim under the age of thirteen." Thus, the majority "conclude[s] that the Court of Appeals erred in limiting its holding to the constitutionality of the program as applied only to defendant, when the analysis of the reasonableness of the search applies equally to anyone in defendant's circumstances."
It is undisputed that defendant is a recidivist. To qualify as a recidivist under the statute, a defendant must have multiple "reportable convictions." Id. § 14-208.6(2b). For example, reportable convictions include comparatively minor sex crimes where the victim is not physically harmed, such as secretly photographing a person for the purpose of gratifying sexual desires (a Class I felony) or solicitation of a child **562 using a computer to commit a sex act (a Class H felony), as well as those society would consider as the worst sex crimes, such as first-degree forcible rape (a Class B1 felony) and child sex trafficking (a Class B2 felony). See id. § 14-208.6(4)(a), (d). If a defendant is convicted of at least two reportable offenses, he qualifies as a recidivist, and the trial court must order the defendant's enrollment in lifetime SBM. Considering the various crimes within the statute's purview, a proper constitutional analysis requires an understanding of the distinction between a facial challenge to the statute and a challenge only as applied to defendant. An as-applied challenge would maintain that the statute is overly broad by including defendant within the recidivist classification, whereas a facial challenge asserts that the statute operates unconstitutionally as to all possible defendants who qualify as recidivists.
The majority holds SBM for any unsupervised defendant falling within the recidivist category is unconstitutional without stating why its analysis applies precisely, but only, to those in this category. Despite its holding, the majority's logic seems to concede the SBM statute's constitutionality. Like those crimes of many other violent sex offenders, defendant's crimes fit two statutory categories: recidivist and aggravated offender. The majority suggests that SBM is unconstitutional for the recidivist category but not for the aggravated offender. Concluding SBM is constitutional for an aggravated offender who is also a recidivist undermines the holding that the entire recidivist category is unconstitutional.
III. Reasonableness As Applied to Defendant
An as-applied challenge concedes a statute's general constitutionality but instead "claim[s] that a statute is unconstitutional on the facts of a particular case or in its application to a particular party." As-Applied Challenge , Black's Law Dictionary (10th ed.
*580 2014). The majority fails to conduct such an analysis. Instead of focusing on the individualized facts of defendant's case as required by an as-applied challenge, the majority generally uses defendant's "circumstances" to create its category encompassing all unsupervised recidivist sex offenders, regardless of the individual offenses represented. Cf. Graham v. Florida , 560 U.S. 48, 91-96, 130 S. Ct. 2011, 2039-42, 176 L.Ed. 2d 825, 856-60 (2010) (Roberts, C.J., concurring in judgment) (promoting a fact-based, instead of a categorical, approach for as-applied challenges). Thus, the majority facially strikes down N.C.G.S. § 14-208.40A(b)(ii) and related provisions that require lifetime SBM for recidivists. See City of Los Angeles v. Patel , --- U.S. ----, 135 S. Ct. 2443, 2457-58, 192 L.Ed. 2d 435, 453 (2015) (Scalia, J., dissenting) (remarking that "the reasoning of a decision may suggest **563 that there is no permissible application of a particular statute .... [and] in this sense, the facial invalidation of a statute is a logical consequence of the Court's opinion, [even if it is] not the immediate effect of its judgment" (citation omitted)). An as-applied challenge should focus on the specific facts underlying a defendant's convictions, and a defendant's as-applied challenge fails if the defendant's conduct is the targeted harm the General Assembly intended to curtail. See Bryant , 359 N.C. at 565, 614 S.E.2d at 486 (stressing that "the role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests" and that "[t]he role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials" (quoting Henry v. Edmisten , 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986) )). If, however, the statute is overly broad as applied to defendant's specific circumstances, the statute is unconstitutional as applied to him. See Britt v. State , 363 N.C. 546, 549-50, 681 S.E.2d 320, 322-23 (2009).
In Britt this court analyzed an as-applied challenge to a new statute that prohibited the plaintiff from owning a firearm because of his nonviolent, drug-related felony conviction decades earlier. Id. at 547, 681 S.E.2d at 321. The plaintiff complied with the statute and then challenged its constitutionality as applied to him. Id. at 548-49, 681 S.E.2d at 322. After noting his longstanding law-abiding history and, when allowed, his lawful and peaceful possession of firearms, this Court restored the plaintiff's right to possess a firearm. Id. at 550, 681 S.E.2d at 323 ("[I]t is unreasonable to assert that a nonviolent citizen who has responsibly, safely, and legally owned and used firearms for seventeen years is in reality so dangerous that any possession at all of a firearm would pose a significant threat to public safety."). In other words, by examining both the plaintiff's previous conviction and subsequent actions, this Court determined that the statute was overly broad and thus unconstitutional as applied to the plaintiff.
Here the statute is not overly broad as applied to defendant because it appears he, as a consequence of his aggravated and repeated sex crimes, poses exactly the public danger the legislature sought to address. He forcibly sodomized a seven-year-old boy with another child watching and, as a result, spent six years in prison. Upon release, defendant failed to register as a sex offender and was placed on probation. He received notice of multiple probation violations, and after a hearing, the trial court gave defendant a second chance by placing him on intensive supervision. While subject to intensive supervision and less than three years after his release from prison, defendant began an illegal **564 sexual relationship with a minor, whom he impregnated. After serving his subsequent prison sentence, defendant again failed to comply with sex offender registry requirements. His resulting two-year prison sentence delayed his initial SBM hearing until he was again released. Since 1996, when not incarcerated, the longest period of time defendant has not committed a sex crime against a minor is the six years (from 2013 to the present) he has been enrolled in SBM. Thus, his underlying convictions for sexually violent offenses and subsequent actions contravene any as-applied argument, for defendant sits squarely within the class of aggravated and recidivist offenders the General Assembly intended to address. *581 IV. Facial Reasonableness of the Statute
A facial challenge maintains the statute "always operates unconstitutionally." Facial Challenge , Black's Law Dictionary (10th ed. 2014). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno , 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L.Ed. 2d 697, 707 (1987) ; see also Patel , 135 S. Ct. at 2449, 2451, 192 L.Ed. 2d at 443, 446 (majority opinion) (applying the Salerno standard to a Fourth Amendment facial challenge). In other words, to succeed in a facial challenge, defendant must shoulder the heavy burden of showing that the statute's SBM requirement could never be reasonably applied to any offender who falls within the statutorily defined categories. See Patel , 135 S. Ct. at 2451, 192 L.Ed. 2d at 445 ("[A] [party] must establish that a 'law is unconstitutional in all of its applications.' " (quoting Wash. State Grange v. Wash. State Republican Party , 552 U.S. 442, 449, 128 S. Ct. 1184, 1190, 170 L.Ed. 2d 151, 160 (2008) )). In the present case, defendant therefore must prove a statute could never constitutionally require enrollment of a defendant in lifetime SBM whose conduct meets the statutory definition of a recidivist. In other words, to support its holding, the majority must show that lifetime SBM is unreasonable for the most heinous crimes that meet the statutory requirements of recidivists and determine if SBM is unreasonable as to every defendant who committed those crimes.
Even though, as discussed, defendant's history of repeated sexual assaults on children places him squarely within the class of those identified by the legislature as requiring SBM to deter their behavior, defendant's behavior here does not encompass all possible scenarios in which the lifetime SBM statute may apply to recidivists. To support its holding, the majority must show that lifetime SBM is unreasonable for everyone **565 who meets the recidivist classification in all circumstances, including the worst violent offenders. Of note, the United States Supreme Court has upheld civil commitment statutes targeting some of these sexually violent predators. See Kansas v. Hendricks , 521 U.S. 346, 350, 117 S. Ct. 2072, 2076, 138 L.Ed. 2d 501, 508 (1997). Thus, the balancing test must include the incremental impact on reasonable privacy interests of those for whom civil commitment may be available.
Under both Samson 's test for individuals with diminished expectations of privacy and Vernonia 's special needs doctrine, the lifetime SBM statute is facially constitutional. A Seventh Circuit panel applied the mandate provided by the United States Supreme Court in Grady to an SBM statute "functionally identical to" North Carolina's statute. Belleau v. Wall , 811 F.3d 929, 939 (7th Cir. 2016) (Flaum, J., concurring). The court held, inter alia , that lifetime SBM constituted a reasonable search under Grady . Id. at 936-37 (majority opinion).
Belleau was a sexually violent predator recently released from civil commitment. Id. at 931. The court first noted Belleau's privacy interests were "severely curtailed as a result of his criminal activities" even though he was not on parole or probation because "persons who have demonstrated a compulsion to commit very serious crimes ... must expect to have a diminished right of privacy as a result of the risk of their recidivating-and ... the only expectation of privacy that the law is required to honor is an 'expectation ... that society is prepared to recognize as reasonable.' " Id. at 935 (third alteration in original) (quoting Katz v. United States , 389 U.S. 347, 361, 88 S. Ct. 507, 516, 19 L.Ed. 2d 576, 588 (1967) (Harlan, J., concurring)). The majority discussed at length the dangers and underreporting of child sexual assaults as well as the high rates of recidivism among convicted sex offenders. Id. at 932-34. Thus, the court concluded the "incremental effect of the challenged statute" on Belleau's privacy was "slight," and the search was reasonable under the Fourth Amendment. Id. at 934-35, 936-37.
In a concurring opinion, Judge Flaum likewise concluded that the lifetime SBM statute did not violate the Fourth Amendment. In doing so he examined "two threads of Fourth Amendment case law: searches of individuals with diminished expectation of privacy [as in *582 Samson ] ... and 'special needs' searches [as in Vernonia ]." Id . at 939 (Flaum, J., concurring). Because the monitoring program's primary purpose was to reduce recidivism, Judge Flaum determined the program served a valid special need; nevertheless, a complete analysis of the search also must balance the public interest and the intrusion on reasonable privacy interests in a context-specific inquiry. Id. at 939-40. Judge Flaum first **566 recognized the government's strong interest in protecting juveniles from sex offenders. Id. at 940 (citing Lile , 536 U.S. at 32-33, 122 S. Ct. at 2024, 153 L.Ed. 2d at 56-57 (plurality opinion)). While acknowledging the significant privacy interest at issue, id. (citing Riley v. California , 573 U.S. 373, 396, 134 S. Ct. 2473, 2490, 189 L.Ed. 2d 430, 447-48 (2014) ), he opined that "the weight of this privacy interest [was] somewhat reduced by Belleau's diminished expectation of privacy. ... [because] a felon's expectation of privacy lies somewhere in-between that of a parolee or probationer and an ordinary citizen," id. at 940-41 (citations omitted). Judge Flaum concluded that because the intrusion upon this diminished privacy was "relatively limited in its scope" when compared with the State's purpose, the SBM statute constituted a reasonable Fourth Amendment search. Id. at 941.
Here, as did the trial court, I agree with the reasoning of the Seventh Circuit and would hold North Carolina's SBM program effects a reasonable search. First, lifetime SBM enrollees have reduced privacy expectations given the nature of their acts and the resulting convictions. Second, the incremental intrusion upon this reduced privacy is slight. Third, the State's interest in, and its special need for, deterring recidivist violent sex offenders is paramount. Finally, this governmental interest outweighs the intrusion upon an SBM enrollee's diminished expectation of privacy in a context-specific balancing test that considers the totality of the circumstances.
The Seventh Circuit's analysis is persuasive here because, for all considerations relevant to a Fourth Amendment analysis, the Wisconsin SBM statute is "functionally identical to" the North Carolina SBM statute. Id. at 939. Both statutes require continuous lifetime SBM for a categorically defined group of convicted sex offenders. See N.C.G.S. § 14-208.40 ; Wis. Stat. Ann. § 301.48(2) (West 2019). The civil SBM programs may apply to unsupervised offenders after they have completed parole, probation, or civil commitment. See Belleau , 811 F.3d at 932 (majority opinion) (recognizing that the offender was "not on bail, parole, probation, or supervised release"); State v. Grady , 817 S.E.2d 18, 24 (N.C. Ct. App. 2018) ("Unsupervised offenders ... are statutorily required to submit to SBM ...."). Moreover, in one notable difference, the Wisconsin statute prohibits certain offenders from ever requesting termination of lifetime SBM and does not allow any offender to petition for termination for at least twenty years, but the North Carolina statute allows a person to apply for termination of "lifetime" SBM beginning one year following the offender's release from prison and completion of any post-release supervision. Compare Wis. Stat. Ann. § 301.48(6)(b)(2), (3), with N.C.G.S. § 14-208.43(a).
**567 An analysis of facial constitutionality starts with defining the scope of the privacy interests involved. "[I]t is beyond dispute that convicted felons do not enjoy the same measure of constitutional protections, including the expectation of privacy under the Fourth Amendment, as do citizens who have not been convicted of a felony." State v. Bowditch , 364 N.C. 335, 349-50, 700 S.E.2d 1, 11 (2010) (citations omitted); see also Vernonia , 515 U.S. at 654, 115 S. Ct. at 2391, 132 L.Ed. 2d at 575 ("[T]he legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State."). Because of their own conduct and propensities that led to their underlying convictions and statutory classifications, felony sex offenders face a plethora of rights restrictions, specifically a reduction in their Fourth Amendment privacy expectations "that society recognizes as 'legitimate.' " Vernonia , 515 U.S. at 654, 115 S. Ct. at 2390-91, 132 L.Ed. 2d at 575 (quoting T.L.O ., 469 U.S. at 338, 105 S. Ct. at 741, 83 L.Ed. 2d at 732 ).
For example, restrictions on firearms possession and voting rights evince a felon's *583 reduced constitutional protections. Cf. District of Columbia v. Heller , 554 U.S. 570, 626, 128 S. Ct. 2783, 2816-17, 171 L.Ed. 2d 637, 678 (2008) (affirming that the "longstanding prohibitions on the possession of firearms by felons" survive Second Amendment scrutiny); Richardson v. Ramirez , 418 U.S. 24, 56, 94 S. Ct. 2655, 2671, 41 L.Ed. 2d 551, 572 (1974) (holding that disenfranchisement of convicted felons who had completed their sentences did not violate the Equal Protection Clause). Furthermore, the sex offender registration requirements of all fifty states manifest a diminished expectation of privacy for sex offenders. Cf. Smith , 538 U.S. at 89-90, 123 S. Ct. at 1145, 155 L.Ed. 2d at 174-75. Society clearly does not afford violent sex offenders a full legitimate expectation of location-based privacy, as exemplified by the limitations on sex offenders' movements. See N.C.G.S. § 14-208.18(a)(1), (4) (2017) (prohibiting sex offenders from being present at "any place intended primarily for the use, care, or supervision of minors, including, but not limited to, schools, children's museums, child care centers, nurseries, and playgrounds," as well as the State Fair); Standley v. Town of Woodfin , 362 N.C. 328, 333, 661 S.E.2d 728, 732 (2008) (upholding prohibition on convicted sex offenders entering public parks). Felony sex offenders may also be barred from certain occupations and professions, a harsh sanction that limits them from choosing where they work and what type of livelihood they may pursue. E.g. , N.C.G.S. § 84-28(b)(1), (c) (2017) (attorney); id. § 90-14(a)(7), (c) (2017) (medical doctor); id. § 93-12(9)(a) (2017) (certified public accountant); id. § 93A-6(b)(2) (2017) (real estate broker). Thus, while recidivist sex offenders have a somewhat greater expectation of privacy than a probationer or parolee, they do not have **568 the same expectations of privacy as members of the general public in light of their prior offenses.[5] ,[6] See Belleau , 811 F.3d at 934-35 (majority opinion) ("Focus[ing] ... on the incremental effect of the challenged statute on ... privacy ... [reveals that the] effect is slight" in the context of a convicted violent sex offender's diminished expectation of privacy); see also Samson , 547 U.S. at 852, 126 S. Ct. at 2199, 165 L.Ed. 2d at 259 (finding no intrusion upon a parolee's diminished expectation of privacy); Vernonia, 515 U.S. at 658, 115 S. Ct. at 2393, 132 L.Ed. 2d at 577 (concluding the intrusion upon privacy was "negligible" in light of student athlete's reduced expectation of privacy at school). *584 First, the physical limitations imposed by SBM are "more inconvenient than intrusive" and do not materially invade defendant's diminished privacy expectations. Grady , 817 S.E.2d at 25. As noted by the trial court, the ankle monitor weighs less than nine ounces, and it "does not **569 prohibit any defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes." Charging the monitor takes at most two hours per day, which poses an insignificant burden considering the ubiquity of other personal electronic devices the average person charges every day.
Second, regarding the effect on other privacy interests, SBM falls on a spectrum of possible "regulatory schemes that address the recidivist tendencies of convicted sex offenders." Bowditch , 364 N.C. at 341, 700 S.E.2d at 6. At one end of the continuum, civil commitment involves a highly invasive affirmative restraint and deprivation of rights similar to imprisonment. See Hendricks, 521 U.S. at 350, 117 S. Ct. at 2076, 138 L.Ed. 2d at 508 ; Belleau, 811 F.3d at 932. Next, career and travel limitations significantly restrict the exercise of fundamental freedoms. Finally, on the other end of the sex offender civil regulatory spectrum, registration statutes impose the fewest restrictions on a defendant's liberty, yet they still require the offender to provide certain information to law enforcement and the public. See N.C.G.S. § 14-208.10 (2017).
At the urging of Congress, every state has adopted a sex offender registration act that requires collection, maintenance, and distribution of information about the registered sex offender and imposes penalties for noncompliance. E.g. , N.C.G.S. § 14-208.7 (2017). See generally Smith , 538 U.S. at 89-90, 123 S. Ct. at 1145, 155 L.Ed. 2d at 174-75. The purposes of sex offender registration are to provide notification to the community and deter future sex offenses. See Smith , 538 U.S. at 102-03, 123 S. Ct. at 1152, 155 L.Ed. 2d at 183. When registering, a sex offender must provide his full name, any aliases, date of birth, sex, race, height, weight, eye color, hair color, driver's license number, home address, the type of offense, the date of conviction, the sentence imposed, a current photograph, fingerprints, and any online identifiers (such as social media usernames). N.C.G.S. § 14-208.7(b). Every six months, the sex offender must verify that his registration information has not changed, and the registrant must provide timely updates regarding any change of address or name, enrollment status in school, or online identifiers. Id. §§ 14-208.9, -208.9A (2017). Moreover, the sex offender's name, sex, address, physical description, picture, conviction dates, offenses, sentences imposed, and registration status are publicly available, and "[t]he sheriff shall release any other relevant information that is necessary to protect the public concerning a specific person." Id. § 14-208.10. Ten years after registering, a sex offender may petition to terminate his registration. Id. § 14-208.12A (2017).
**570 Thus, along the spectrum of possible regulatory schemes, SBM's privacy intrusion is most similar to sex offender registration. Both programs mandate disclosing information to the State that is not ordinarily required for the general public. Both protect the public through deterrence. Both allow for termination, SBM after one year and registration after ten years. In contrast with the other options, "[t]he SBM program does not detain an offender [or resemble imprisonment] in any significant way." Bowditch , 364 N.C. at 349, 700 S.E.2d at 11. Additionally, "[t]he monitoring taking place in the SBM program is far more passive and is distinguishable from the type of State supervision imposed on probationers," and "[o]ccupational debarment is far more harsh than an SBM program." Id. at 346, 349, 700 S.E.2d at 9-10, 364 N.C. 335 ; see also Doe v. Bredesen, 507 F.3d 998, 1005 (6th Cir. 2007) (citing Smith , 538 U.S. at 100, 123 S. Ct. at 1151, 155 L.Ed. 2d at 181 ) (noting SBM is less harsh than occupational debarment), cert. denied , 555 U.S. 921, 129 S. Ct. 287, 172 L.Ed. 2d 210 (2008).
Accordingly, in the totality of the circumstances, SBM that provides information regarding physical location and movements effects a small, incremental intrusion in the context of the diminished expectation of privacy that society would recognize as legitimate. SBM does not prevent a defendant *585 from going anywhere he is otherwise allowed to go. The tracking mechanism only passively collects location data; as the trial court found, "[T]he ankle monitor does not monitor or reveal the activities of the offender-it merely monitors his location." See also Belleau , 811 F.3d at 936 ("It's untrue that 'the GPS device burdens liberty ... by its continuous surveillance of the offender's activities'; it just identifies locations; it doesn't reveal what the wearer of the device is doing at any of the locations." (alteration in original) (quoting Commonwealth v. Cory , 454 Mass. 559, 570, 911 N.E.2d 187, 196 (2009) )). Where a defendant is unsupervised, no one regularly monitors the defendant's location, significantly lessening the degree of intrusion. See id. at 941 (Flaum, J., concurring). Furthermore, though the program is referred to as "lifetime" monitoring, a defendant may petition to be removed from SBM after one year. N.C.G.S. § 14-208.43 (permitting termination if a defendant shows he has not been convicted of any additional qualifying convictions, has substantially complied with the SBM program, and "is not likely to pose a threat to the safety of others"). Therefore, in the context of diminished privacy expectations, SBM's degree of intrusion is minimal.
On the other hand, regarding "the public interest, in this case, the state's interest can hardly be overstated." Belleau , 811 F.3d at 940. The General Assembly has "recognize[d] that sex offenders often pose a high **571 risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest." N.C.G.S. § 14-208.5. More specifically, "[t]he General Assembly also recognizes ... that the protection of [sexually abused] children is of great governmental interest." Id. This finding is supported by United States Supreme Court precedent, congressional action, the public policy of all fifty states, and "the moral instincts of a decent people." Packingham , 137 S. Ct. at 1736, 198 L.Ed. 2d at 281 ; see 34 U.S.C.A. § 20981 ; Conn. Dep't of Pub. Safety , 538 U.S. at 4, 123 S. Ct. at 1163, 155 L.Ed. 2d at 103 ; Smith , 538 U.S. at 89-90, 123 S. Ct. at 1145, 155 L.Ed. 2d at 174-75.[7] Therefore, requiring enrollment in SBM accomplishes the General Assembly's purpose of protecting the public by deterring violent sex offenders from committing further sex crimes, thereby "promot[ing] ... legitimate governmental interests." Samson , 547 U.S. at 848, 126 S. Ct. at 2197, 165 L.Ed. 2d at 256 (quoting Knights , 534 U.S. at 119, 122 S. Ct. at 591, 151 L.Ed. 2d at 505 ).[8]
Finally, the paramount governmental interest outweighs the minimal intrusion upon diminished privacy interests when considering the totality of possible circumstances that may arise under the statute. Here the facially challenged statutes reasonably provide for lifetime SBM for the worst recidivist sexual offenders, and lifetime SBM is significantly less invasive than civil commitment or other regulatory options available for those offenders. The majority, however, putting itself *586 in the **572 place of the legislature, would draft a statute excluding sexually violent recidivists from mandatory lifetime SBM, yet the case law is clear that courts should not assume the role of the legislature when the legislative categories are reasonable. See, e.g., Smith , 538 U.S. at 103-04, 123 S. Ct. at 1153, 155 L.Ed. 2d at 184 ("[Where] [t]he legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class[,] .... [a State is] not preclude[d] ... from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."); Bredesen , 507 F.3d at 1007 ("[O]ur role is not to invalidate the [SBM] program if the ... Legislature has not struck the perfect balance between the regulatory purpose of the program and its burdens on [our] citizens, but rather to determine whether the means chosen are reasonable."). The majority expresses concern that "[a] wide range of different offenses are swept into" the statute's definition of recidivist, but if the statute is ever overbroadly applied to a defendant, he can bring an as-applied challenge that takes into account his specific convictions, circumstances, and facts. See Britt , 363 N.C. at 549-50, 681 S.E.2d at 322-23.
Moreover, the majority's sweeping analysis jeopardizes most applications of the lifetime SBM statute. Despite the majority's strenuous insistence that its reasoning only addresses lifetime SBM for recidivists without affecting lifetime SBM for sexually violent predators, aggravated offenders, and adults who otherwise sexually victimize children under thirteen years old, the facts, analysis, and ultimate outcome of this case demonstrate otherwise. The majority's approach is devoid of any discussion as to why SBM is unconstitutional for the worst crimes that would place a defendant in the statutory category of recidivist. Further, by upholding the reversal, without remand of the trial court's order requiring lifetime SBM, the majority's disposition does not effect the result it claims in its reasoning. Rather, affirming the Court of Appeal's reversal removes defendant, whose convictions satisfy the statutory definition for an aggravated offender, from the lifetime SBM program without directing the trial court to determine whether he qualifies for lifetime SBM as an aggravated offender. This decision would seem to prevent lifetime SBM for a defendant who is a recidivist but also qualifies for lifetime SBM under a different statutory subsection.[9] Thus, not only does the majority's facial analysis fail to consider all possible scenarios in **573 which the lifetime SBM statute may apply to recidivists, but it also does not address the specific result of its holding on defendant here. Because the statute requiring lifetime SBM can be constitutionally applied to sexually violent recidivists, such as defendant, defendant's facial challenge should fail.
V. Special Needs Search[10]
Lastly, the SBM program serves a "special need[ ], beyond the normal need for law enforcement, [that] make[s] the warrant and probable-cause requirement impracticable." Vernonia , 515 U.S. at 653, 115 S. Ct. at 2391, 132 L.Ed. 2d at 574 (quoting Griffin , 483 U.S. at 873, 107 S. Ct. at 3168, 97 L.Ed. 2d at 717 ). The special needs doctrine does not apply where "the primary purpose of the ... program is to uncover evidence of ordinary criminal wrongdoing," City of Indianapolis v. Edmond , 531 U.S. 32, 41-42, 121 S. Ct. 447, 454, 148 L.Ed. 2d 333, 343 (2000), but conversely, "a program satisfies a special need if the program 'is not undertaken for *587 the investigation of a specific crime,' " Belleau , 811 F.3d at 940 (quoting Green v. Berge , 354 F.3d 675, 678 (7th Cir. 2004) ). " '[S]pecial needs' have been found 'not because the rules [for warrants and probable cause] are inconvenient to follow,' but rather 'because in such situations, the rules are not needed to prevent the mischief that [warrants] are designed to prevent.' " United States v. Amerson , 483 F.3d 73, 82 (2d Cir. 2007) (second alteration in original) (quoting Nicholas v. Goord , 430 F.3d 652, 680 (2d Cir. 2005) (Lynch, J., concurring), cert. denied , 549 U.S. 953, 127 S. Ct. 384, 166 L.Ed. 2d 270 (2006) ), cert. denied , 552 U.S. 1042, 128 S. Ct. 646, 169 L.Ed. 2d 515 (2007). "The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.' " Maryland v. King , 569 U.S. 435, 447, 133 S. Ct. 1958, 1969-70, 186 L.Ed. 2d 1, 20 (2013) (alteration in original) (quoting Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 667, 109 S. Ct. 1384, 1391, 103 L.Ed. 2d 685, 703 (1989) ); see also **574 Delaware v. Prouse , 440 U.S. 648, 653-54, 99 S. Ct. 1391, 1396, 59 L.Ed. 2d 660, 667 (1979) (remarking that the Fourth Amendment's purpose "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials" (footnote omitted)).
Thus, case law recognizes that the government's interest in deterring at-risk individuals from activity detrimental to public safety is a special need when the search does not constitute an investigation of a specific crime and does not involve the exercise of discretion by law enforcement officers. See Vernonia , 515 U.S. at 658 n.2, 115 S. Ct. at 2393 n.2, 132 L.Ed. 2d at 578 n.2 (distinguishing the "prophylactic and distinctly non punitive purposes (protecting student athletes from injury, and deterring drug use in the student population)" of the programmatic search effected by drug testing from " 'evidentiary' searches, which generally require probable cause"); see also Von Raab, 489 U.S. at 666, 109 S. Ct. at 1391, 103 L.Ed. 2d at 702 (upholding a drug-screening program "to deter drug use" among certain United States Customs Service employees as a special needs search); Skinner v. Ry. Labor Execs.' Ass'n , 489 U.S. 602, 632-33, 109 S. Ct. 1402, 1421-22, 103 L.Ed. 2d 639, 670 (1989) (finding that, because a drug-screening program for railroad employees was "designed not only to discern [drug and alcohol] impairment but also to deter it," the search was a special needs search that furthered the government's interest in deterring "hazardous conduct" that puts the public at risk).
Here the SBM program's primary purpose is to serve the special need of "protecting the public against recidivist tendencies of convicted sex offenders." Bowditch , 364 N.C. at 351, 700 S.E.2d at 12 (recognizing deterrence as a purpose and effect of SBM). Because "there is no specific crime to give rise to probable cause," the search effected by the SBM program is not predicated on the judgment or discretion of law enforcement or any other government official, and "[a]ccordingly, the traditional safeguards of the Fourth Amendment, such as the warrant requirement, are unworkable." Belleau , 811 F.3d at 941.[11] Thus, the SBM program is constitutional pursuant to the special needs doctrine.
**575 VI. Conclusion
"Although privacy is a value of constitutional magnitude, it must yield, on occasion, to the state's substantial interest to protect the public through reasonable regulations in appropriate circumstances. This case presents one of those circumstances." Belleau , 811 F.3d at 939. The search arising from the SBM statute for a limited category of high-risk recidivist sex offenders, given the totality of the circumstances, is a reasonable search under the Fourth Amendment. The purpose of the SBM program in protecting the public from sex crimes is of paramount importance. As demonstrated by several other constitutionally sound regulations designed *588 to protect the public from sex offenders, defendant's reasonable expectation of privacy is significantly diminished because of his multiple child sex offenses. Given his diminished privacy expectations, the incremental nature of the search providing location information and the method of data collection via an ankle bracelet are more inconvenient than intrusive. While courts must continue to "approach the government's use of [GPS technology] with caution, to ensure that it does not upset the balance of rights bestowed by the Constitution," id. at 938-39, the SBM search here is reasonable, and the statute is constitutional. The decision of the Court of Appeals should be reversed and the trial court's SBM order reinstated. Accordingly, I respectfully dissent.
Justice MORGAN joins in this dissenting opinion.

Because defendant's status as a recidivist was uncontested, neither party fully developed the record as to the other lifetime SBM categories applicable to defendant's crimes.

Though not addressed by the trial court, defendant's conviction for anally penetrating a seven-year-old boy constitutes an "aggravated offense" under the statute, providing an alternate and independent ground for imposing lifetime SBM. See N.C.G.S § 14-208.6(1a) (Supp. 2018) (An "[a]ggravated offense" is "[a]ny criminal offense that includes ... engaging in a sexual act involving vaginal, anal, or oral penetration with a victim who is less than 12 years old."). That defendant is an aggravated offender is a conclusion of law, not a finding of fact, because the underlying facts of and conviction for the assault that satisfy the statutory criteria were previously found by a trial court.

At the various stages throughout the appellate process, it has been unclear whether defendant is making a facial or an as-applied challenge. Generally, it appears defendant has asserted a facial challenge or has attempted to articulate a hybrid of facial and as-applied challenges. On remand from the United States Supreme Court, the trial court explicitly found the statute to be constitutional on its face, thereby indicating that defendant's argument, at least as understood by the trial court, was that the statute was facially unconstitutional. The Court of Appeals, however, held that the State failed to meet its evidentiary burden that the statute was reasonable as applied to defendant. See State v. Grady , 817 S.E.2d 18, 28 (N.C. Ct. App. 2018). Defendant argues both facial and as-applied invalidity in his brief here.

See 28 C.F.R. § 2.204(b)(2)(iii) (2018) (permitting electronic tracking in Washington, D.C.); Ala. Code § 15-20A-20 (LexisNexis 2018) ; Alaska Stat. § 12.55.027(d), (g)(3) (2018) ; Ariz. Rev. Stat. Ann. § 13-902(G) (Supp. 2018); Ark. Code Ann. § 12-12-923 (2016); Cal. Penal Code § 3004(b) (West Supp. 2019) ; Colo. Rev. Stat. §§ 18-1.3-204(2)(a)(XIV.5), -1007(2) (2018) ; Conn. Gen. Stat. Ann. § 53a-30(a)(14) (West Supp. 2019); Del. Code Ann. tit. 11, § 4121(u) (2015); Fla. Stat. Ann. § 948.30(2) -(3) (West Supp. 2019) ; Ga. Code Ann. § 42-1-14(e) (Supp. 2017); Haw. Rev. Stat. Ann. § 706-624(2)(p) (LexisNexis Supp. 2018); Idaho Code § 18-8308(3) (2016) ; 730 Ill. Comp. Stat. Ann. 5/5-8A-6 (West Supp. 2019) ; Ind. Code Ann. § 11-13-3-4(j) (LexisNexis Supp. 2018); Iowa Code Ann. § 692A.124(1) (West 2016); Kan. Stat. Ann. § 22-3717(u) (Supp. 2018); La. Stat. Ann. § 15:560.4(A) (2012); Me. Rev. Stat. Ann. tit. 17-A, § 1204(2-A)(N) (Supp. 2018); Md. Code Ann., Crim. Proc. § 11-723(d)(3)(i) (LexisNexis 2018); Mass. Ann. Laws ch. 265, § 47 (LexisNexis Supp. 2019); Mich. Comp. Laws Ann. § 750-520n(1) (West Supp. 2019); Minn. Stat. Ann. § 609.135(5a)(b)(8), (5a)(c) (West 2018); Miss. Code Ann. § 99-19-84 (2015) ; Mo. Ann. Stat. § 217.735(4) (West Supp. 2019); Mont. Code Ann. § 46-18-206 (2017); Neb. Rev. Stat. Ann. § 83-174.03(4)(g) (LexisNexis 2019); Nev. Rev. Stat. Ann. § 176A.410(2)(b) (LexisNexis 2016); N.H. Rev. Stat. Ann. § 651:2(V)(b) (LexisNexis Supp. 2018); N.J. Stat. Ann. § 30:4-123.92 (West 2008) ; N.M. Stat. Ann. § 31-21-10.1(E) (Supp. 2018); N.Y. Penal Law § 65.10(4), (5-a) (McKinney Supp. 2019); N.C.G.S. § 14-208.40A(c) (2017) ; N.D. Cent. Code § 12.1-32-07(3)(f) (Supp. 2017); Ohio Rev. Code Ann. § 2929.13(L) (West Supp. 2019); Okla. Stat. Ann. tit. 22, § 991a(A)(12) (West Supp. 2019); Or. Rev. Stat. § 144.103(2)(c) (2017); 42 Pa. Stat. and Cons. Stat. Ann. § 9799.30 (West 2014) ; 11 R.I. Gen. Laws § 11-37-8.2.1 (Supp. 2018); S.C. Code Ann. § 23-3-540 (Supp. 2018) ; S.D. Codified Laws § 24-15A-24 (2013) ; Tenn. Code Ann. § 40-39-303 (Supp. 2018); Tex. Code Crim. Proc. Ann. art. 42A.301(b)(16) (West 2018); Utah Code Ann. § 77-18-1(8)(d) (LexisNexis Supp. 2018); Va. Code Ann. § 19.2-303 (2015) ; Wash. Rev. Code Ann. § 9.94A.704(5)(b) (West 2019); W. Va. Code Ann. § 62-11D-3(a) (LexisNexis 2014); Wis. Stat. Ann. § 301.48 (West 2019) ; Wyo. Stat. Ann. § 7-13-1102(b)(i) (2017).

The majority asserts that "except as reduced for possessing firearms and by providing certain specific information and materials to the sex offender registry, defendant's constitutional privacy rights, including his Fourth Amendment expectations of privacy, have been restored." The majority's logic is backwards. Defendant's expectation of privacy is not reduced "by" the sex offender registry; rather, the sex offender registry may require defendant to provide information because his privacy rights are reduced. The majority offers no explanation for why the scope of diminished privacy expectations is restricted to only those reductions implicated by firearm possession and the sex offender registry. Rather, the actual issue is what reductions in reasonable expectations of privacy does society recognize as legitimate for recidivist violent sex offenders. See Vernonia , 515 U.S. at 654, 115 S. Ct. at 2391, 132 L.Ed. 2d at 575 (quoting T.L.O. , 469 U.S. at 338, 105 S. Ct. at 741, 83 L.Ed. 2d at 732 ).

In Carpenter v. United States , the Supreme Court held that, for citizens without a reduced expectation of privacy, government tracking of a suspect's location without a warrant substantially intrudes upon reasonable privacy rights. --- U.S. ----, 138 S. Ct. 2206, 2217, 201 L.Ed. 2d 507, 521 (2018). There the police acquired the defendant's cell site location information (CSLI) containing the time-stamped locations of his cell phone for an extended period of time. See id. at 2217, 2220, 201 L.Ed. 2d at 521, 525 (narrowly limiting the holding to "legitimate expectation[s] of privacy in the record of [the defendant's] physical movements as captured through CSLI"). The Court expressed concern that allowing police to surreptitiously invade reasonable expectations in this manner would expose an expansive class of individuals (i.e., anyone with a cell phone) to unfettered government surveillance. See id. at 2218, 201 L.Ed. 2d at 522 ("Only the few without cell phones could escape this tireless and absolute surveillance."). Here those concerns are not present. Lifetime SBM only applies to a narrow, statutorily defined class of convicted sex offenders. The police have no discretion over who is searched, and thus the SBM program does not raise the same concerns of arbitrary, universal tracking at issue in Carpenter . See id. at 2213, 201 L.Ed. 2d at 517 ("The basic purpose of [the Fourth] Amendment ... is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (internal quotation marks and citation omitted)); see also id. at 2214, 201 L.Ed. 2d at 518 ("[A] central aim of the Framers was to place obstacles in the way of too permeating police surveillance." (internal quotation marks and citation omitted)).

When presented with conflicting evidence supporting the legislature's public policy determinations, courts should defer to the legislature's findings of fact, especially where, like here, that determination is overwhelmingly corroborated. Additionally, the trial court considered "multiple studies of recidivism rates of sex offenders versus other criminals" and found the search reasonable in light of this evidence.

"[I]t is undisputed that the [SBM] law promotes deterrence .... [which] appears to be the primary purpose of the law." Belleau , 811 F.3d at 943 ; accord Bredesen , 507 F.3d at 1007. Moreover, the efficacy of SBM as a deterrent is self-evident: The search "deter[s] future offenses by making the plaintiff aware that he is being monitored and is likely therefore to be apprehended should a sex crime be reported at a time, and a location, at which he is present." Belleau , 811 F.3d at 935 (majority opinion); see also Vernonia , 515 U.S. at 663, 115 S. Ct. at 2395-96, 132 L.Ed. 2d at 581 (remarking that the "efficacy" of the search was "self-evident" where the goal was to deter drug use by athletes and the school promulgated the drug-testing policy so that athletes would know they would be tested); Skinner v. Ry. Labor Execs.' Ass'n , 489 U.S. 602, 629-30, 109 S. Ct. 1402, 1420, 103 L.Ed. 2d 639, 668 (1989) (recognizing that it is "common sense" that employees must "know they will be tested" for drugs and alcohol in order to deter substance abuse). Thus, there is no need for individualized inquiries into the efficacy of deterring a particular defendant, nor is the State required to prove this common sense principle with empirical evidence. Nonetheless, since 1996, when not incarcerated, the longest period of time defendant has not committed a sex crime against a minor is the six years he has been subject to SBM.

Notably, the trial court could not alternatively enroll a recidivist defendant in SBM for a term of years either. N.C.G.S. § 14-208.40A(d).

Because defendant has a reduced expectation of privacy, the special needs doctrine does not apply here. See Maryland v. King , 569 U.S. 435, 463, 133 S. Ct. 1958, 1978, 186 L.Ed. 2d 1, 30 (2013) ("The special needs cases ... do not have a direct bearing on the issues presented in this case, because unlike the search of a citizen who has not been suspected of a wrong, [the defendant] has a reduced expectation of privacy."); Samson , 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L.Ed. 2d at 259 n.3 ("[W]e [do not] address whether ... [the] search ... is justified as a special need ... because our holding under general Fourth Amendment principles renders such an examination unnecessary."). Nevertheless, in accordance with the Supreme Court's mandate and in response to the majority opinion, I discuss the application of the special needs doctrine arguendo .

As a secondary benefit, the program creates a repository of information that law enforcement may use to detect or preclude the enrollee's involvement in future sex offenses. While the "[i]nformation gathered from this program may, at some later time, be used as evidence in a criminal prosecution, ... the program is setup [sic] to obviate the likelihood of such prosecutions" and, therefore, still falls within the scope of the special needs doctrine. Belleau , 811 F.3d at 940. Furthermore, the collection of this information provides the deterrent effect.